THOMPSON-STARRETT COMPANY *v.* E. B. ELLIS GRANITE COMPANY.

May Term, 1912.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed November 11, 1912.

*Mortgages—Right to Foreclose—Premature Foreclosure—Allegations of Petition—How Aided by Answer—Corporations—Voting Trust—Validity—Interest of Trustee—Fraud—Violation of the Agreement—Rescission of Contracts—Master's Report—Recommitment—Discretion—Exception to Report—Certainty of Findings—Waiver of Exceptions.*

Where, contemporaneously with the execution and delivery to petitioner of a mortgage of defendant's granite quarry and plant, and as part of the consideration therefor, petitioner executed and delivered to defendant a written contract, providing that petitioner would not demand payment of any part of the debt secured by the mortgage, nor foreclose it, until the completion of designated contracts between the parties then in force, and such other contracts for furnishing granite as might thereafter be entered into between them, petitioner could not mature an existing uncompleted contract, so as to entitle it to foreclose the mortgage, by crediting defendant with the full consideration due defendant on the completion of the contract.

An orator must stand or fall on the case made by his bill, regardless of what is shown or admitted by the answer.

Where a voting trust of the corporate stock of a mortgagor was created for further security of a mortgagee by the deposit of the stock with a designated trustee, and there was nothing in the situation of the parties when the contract was made that required the trustee should be wholly disinterested, the fact that the trustee was interested in the stock, and that the mortgagee knew of such interest and concealed it from the mortgagor, did not render the trust agreement fraudulent as against the mortgagor.

The breach of a contract by one of the parties discharges the other party from further performance on his part only where the breach goes to the essence of the contract.

Where it was a question for the court to determine whether certain provisions of a written contract were of the essence, the admission of evidence that petitioner would not have made the contract but for such provisions was not prejudicial to defendant.

A voting trust agreement is not illegal *per se*, and, in the absence of constitutional or statutory restrictions, stockholders may suspend for a time the right to vote their stock, and vest that right in others who have a beneficial interest in the stock, or in the corporate business.

Where defendant corporation, owning and operating a granite quarry, had been given by petitioner important contracts for the furnishing of granite, and petitioner advanced defendant $200,000 secured by a mortgage on its quarry and plant, and a contemporaneous agreement was executed whereby petitioner agreed not to foreclose while any contract between the parties remained unperformed, and whereby certain of the corporate stock of defendant corporation should be deposited with a designated trustee who should be entitled to vote the stock as both parties should dictate, if they agreed, otherwise in the manner it deemed best, and the trust agreement was intended to furnish petitioner further security for its advancement, the transfer of the stock to the trustee was not only based on a sufficient consideration, but the trust being coupled with an interest was irrevocable, and the provisions with reference to the trust were of the essence of the contract, and, on refusal by defendant to allow the trustee to vote the stock, petitioner was entitled to treat the whole contract as terminated and foreclose the mortgage, notwithstanding there were uncompleted contracts between the parties.

A motion to recommit a case to a master is addressed to the sound discretion of the chancellor, and the denial thereof will not be reviewed, unless an abuse of discretion is shown.

Exceptions to a master's report which fail to state the grounds on which they are predicated will not be considered on review.

Exceptions to a master's report involving evidence not sent up will not be considered on review.

Requests to a master to report the evidence on which he bases designated findings are addressed to his discretion, where the chancellor has made no order in respect thereof, and exceptions to the denial of such requests will not be considered on review.

Defendant's request to a master that petitioner be required to produce its books showing the cost of certain items of which defendant

was charged a *pro rata* share was addressed to the sound discretion of the master, and an exception to his denial thereof will not be considered on review.

Where there were contracts between petitioner and defendant, and pending their fulfilment petitioner demanded that defendant pay half the salary of S. after June 1904, and defendant did so without protest till January 1, 1905, when petitioner required defendant to pay all of such salary which it thereafter did without protest, a finding that the original contract between the parties was modified according to petitioner's demands by their consent and understanding is not objectionable as uncertain and contradictory so as to make doubtful defendant's right to charge the amounts so contributed to the salary as payments to petitioner.

Exceptions not briefed by the exceptor will not be considered on review.

APPEAL IN CHANCERY. Heard on the pleadings, master's report, defendant's exceptions thereto, and its motion to recommit the report, at the March Term, 1912, Washington County, *Waterman,* Chancellor. Exceptions and motion overruled, and decree for the petitioner. The defendant appealed. The opinion states the case.

*Henry L. Clark* and *W. B. C. Stickney* for the petitioner.

The creation of the voting trust was not to subserve the private or personal advantage of either of the contracting parties, but on the contrary it was in the nature of an agreement to promote harmony and stability of management in carrying out an honest business policy consistent with what the contracting parties believed to be the best interests of all the stockholders. Such a transaction is not unlawful. *Kreissl* v. *Distilling Co. of America,* 61 N. J. Eq. 5; *Griffith* v. *Jewett,* 9 Ohio Dec. 627; *Rigg* v. *Reading etc. R. Co.,* 191 Pa. St. 298; *Chapman* v. *Bates,* 60 N. J. Eq. 17; *Smith* v. *San Francisco etc. R. Co.,* 115 Cal. 584; *Havemeyer* v. *Havemeyer,* 43 N. Y. Sup. Ct. 506, 86 N. Y. 618; *Mobile etc. R. Co.* v. *Nicholas,* 98 Ala. 92; *Faulds* v. *Yates,* 57 Ill. 416, 11 Am. Rep. 24.

*Plumley & Plumley* and *George W. Wing* for the defendant.

POWERS, J.   This was a statutory petition in common form for the foreclosure of a certain mortgage dated July 24, 1905, and conditioned for the payment of $200,000 in two years from that date.   The defendant filed an answer, therein alleging that at the time of the execution and delivery of this mortgage, and as a part of the consideration therefor, the petitioner executed and delivered to the defendant a written contract wherein it was provided, among other things, that the petitioner should not demand payment of any part of the debt secured by said mortgage, nor foreclose the same until the completion of certain contracts then in force between said parties and such other contracts for furnishing granite as might thereafter be entered into between them.   And the defendant alleged that, at the time the petition was brought and served, there was such a contract in force between the parties which was not fully completed.   And that for this reason the suit was premature.   Thereupon, the petitioner amended his petition by inserting therein copies of certain sections of said contract numbered I, III, V, VI and VII, and alleging full performance, on its part, of all the requirements of this contract.   The amendments also showed that the unfinished contract referred to in the defendant's answer was one for six monolithic statues which were to be placed on the Union Station at Washington, the price of which was fixed at $40,000.   It was also alleged that these had not been delivered on account of the defendant's unwarranted delays, and that the defendant had received the full contract price therefor.   The amendments further alleged that the defendant had broken the contract and deprived the petitioner of the benefit thereof by repudiating the voting trust arrangement provided for in section VI thereof.

The defendant again answered, and alleged that certain sections of the contract were omitted from the amended petition, and making the whole contract a part of the answer by reference.

The petitioner filed a replication and the cause was referred to a special master to find and report the facts bearing upon the question whether the suit was prematurely brought.   A report was filed, from which it appears that the contract for the six statues was not then completed; that this was through no fault of the defendant; and that the petitioner had, before suit, credited the defendant with the full contract price thereof.   The master also reported that the defendant refused to allow the

trustee referred to in sec. VI of the contract to vote the stock at a meeting of the stockholders, that there was no fraud practiced on the defendant in the selection of the trustee, and that it was the purpose of the petitioner in creating the voting trust to control, if necessary, the selection of officers and the management of the defendant corporation, to the end that the money loaned to it should be secured; and that this provision was one of the essential provisions of the contract.

Both parties filed exceptions to this report and on hearing the chancellor, after expressing his views on some of the questions submitted but without making any further order, recommitted the cause to the master for a full hearing on all questions,—reserving to the defendant the right to raise the question whether the petition was prematurely brought at the final hearing.

A full hearing was then had, and another report was filed by the master. The defendant filed a motion to recommit this report, and also filed exceptions thereto. Both the motion and the exceptions were overruled, and a decree was entered for the petitioner with a short day of redemption. The defendant appealed.

If the rights of these parties depended wholly on sec. I of the contract, the suit was plainly premature; for it is therein expressly provided that the mortgage shall not be foreclosed until all contracts for furnishing granite are completed, and it is expressly found that one of such contracts was not then completed. The petitioner does not avoid the effect of this provision when it asserts that the credit given the defendant for the full contract price is tantamount to a completion of the contract. This is not what the parties stipulated for,—either in terms or effect. If we were to say that this is what they meant, we should largely eliminate the advantage which this provision afforded the defendant; for it would then lie in the power of the petitioner to fix at its pleasure the time when its mortgage should be ripe for foreclosure. All it would have to do would be to place the amount of the contract price to the credit of the defendant, and proceed. This might leave the defendant wholly unable to complete, not only this, but his other contracts. While if the petitioner waited for the event specified in the contract,—the completion of the statues,—the defendant would have a con-

siderable time, a year probably, in which to meet the requirements of its contract with the petitioner and to enjoy the beneficial use of its property.

But the petitioner says its right to foreclose is established by sec. II of the contract, which, while not set forth in the petition, is made a part of the pleading by the answer.   This section provides that if the mortgage should be foreclosed prior to the completion of such contracts, the petitioner should fully reimburse and indemnify the defendant for any damage suffered thereby.   We are not called upon to determine the effect of this provision, for the petitioner is not in a position to take advantage of it even if its effect is what is claimed for it.   An orator must stand or fall upon the case made by his bill, and any fact admitted or shown by the answer cannot avail him unless that fact is alleged in the bill.   The reason is that the court "pronounces its decree *secundum allegata et probata.*"   This rule is fully established not only here,—*Thomas* v. *Warner,* 15 Vt. 110, *Nye* v. *Stewart,* 83 Vt. 521, 77 Atl. 340,—but elsewhere.   16 Cyc. 311; 1 Dan. Ch. 335, n. 4; Story Eq. Pl., §257; *James* v. *M'Kernon,* 6 Johns. 543; *Jackson* v. *Ashton,* 11 Pet. 229, 9 L. ed. 698.

The petitioner also claims that his right to foreclose is restored by the defendant's breach of the provisions of secs. V and VI of the contract.   It appears from the report that by previous arrangements the petitioner had become the owner of a large number of the shares of the capital stock of the defendant company, and that it had acquired a larger number of shares of this stock as collateral security.   By sec. V it was provided that all of such stock then held by the orator as collateral should be released and surrendered; and by sec. VI it was provided that the petitioner, E. B. Ellis, Goldwin Starrett and Roger Sherman should transfer all their stock in the defendant company to the Title Guaranty & Trust Co. of New York, as trustee. and take its certificates therefor; that the trustee should hold the stock and vote it as the certificate holders directed, so long as they agreed; that if the certificate holders disagreed, the trustee should vote the stock as it deemed proper.

It is alleged in the petition that this provision was an essential and necessary feature of the contract, and that the defendant wilfully violated the same and deprived the petitioner of the

benefit thereof by repudiating it and preventing the trustee from acting thereunder, thereby preventing a fair and impartial management of the business of the defendant, and enabling it to continue in practices of delay and improvidence to the detriment of the petitioner's interests. The answer admits that the defendant, at its annual meeting in January, 1909, repudiated this voting agreement and that it has ever since refused to be bound by it. The excuse given for this action is that at the time the contract was made, the defendant supposed the trustee was wholly disinterested; but that it afterwards discovered that the trustee was then interested in the stock of the petitioner, represented on its board of directors, and that it had now become the owner of a majority of the stock of the petitioner; and that the petitioner knew all the time of the trustee's interest and fraudulently concealed the same from the defendant.

The master finds that the trustee was not allowed to vote the stock at a certain meeting of the stockholders. This refers, probably, to the annual meeting of 1909, though the master does not say so. He finds, in effect, that the trustee was, at the time the contract was made, interested as stated, but that there was no fraud unless such facts of themselves amount to fraud. He does not find that the petitioner concealed this fact from the defendant, or indeed, that the defendant was ignorant of it. But assuming the defendant's ignorance, and assuming that the orator failed to disclose the interest of the trustee, we cannot say that these facts amount to fraud. There was nothing in the situation of these parties when this contract was entered into that required that the trustee should be without interest. One of the purposes for which the contract was made, as expressed in the preamble, was "that further security may be furnished" to the petitioner for its advances to the defendant. The mortgage given at the time was for $200,000, and there was evidence that the overpayments then exceeded that amount. The master infers that a trustee was selected who, in case of a disagreement between the stockholders, would vote the stock in the interests of the lender,—the petitioner. When we remember that all this stock of Ellis and of Starrett was, at the time the contract was executed, in the petitioner's custody as collateral, and that the petitioner also deposited its stock with the trustee under the

arrangement, it cannot be said that the interest of the trustee made the petitioner's conduct fraudulent *per se.*

It does not of necessity follow, however, that this breach of the contract by the defendant gave the petitioner the right to treat the whole contract at an end. It is only when the breach of such a contract goes to its essence that it operates as a discharge. Harr. Cont. §§516, 519; *Rioux* v. *Ryegate Brick Co.,* 72 Vt. 148, 47 Atl. 406. So the question is are the provisions of sec. VI of the essence of the contract?

The master says, in substance, that they are. And on this point he received the testimony of one Horowitz to the effect that the contract would not have been entered into by the petitioner if these provisions had been left out. This evidence was taken subject to the defendant's objection and exception; but its admission did no harm, for the question is one of construction,— 9 Cyc. 649, Harr. Cont. §284,—and is, therefore, for the court to decide. *Gove* v. *Downer,* 59 Vt. 139, 7 Atl. 463; *White* v. *Lumiere etc. Co.,* 79 Vt. 206, 64 Atl. 1121, 6 L. R. A. (N. S.) 807; *Mellen* v. *U. S. Health & Acc. Ins. Co.,* 85 Vt. 305, 82 Atl. 4.

The defendant says that the agreement referred to amounts to a voting trust, and is therefore illegal and void. But this result does not necessarily follow. Such agreements are not illegal *per se.* Their validity depends upon the purposes they are designed to subserve. Where these purposes are lawful, stockholders may, in the absence of constitutional or statutory restrictions, suspend for a time the right to vote their stock and vest it in others who have a beneficial interest in it or the corporate business,—as corporate creditors or a trustee for them. 10 Cyc. 341; 2 Purdy's Beach, Priv. Corp., 1029; *Smith* v. *San Francisco etc. R. Co.,* 115 Cal. 584, 56 Am. St. Rep. 119, 47 Pac. 582, 35 L. R. A. 309, and note; note to *Morel* v. *Hoge,* 14 Ann. Cas. 935; *Mobile etc. R. Co.* v. *Nicholas,* 98 Ala. 92, 12 South. 723; *Faulds* v. *Yates,* 57 Ill. 422, 11 Am. Rep. 24; *Hall* v. *Merrill Trust Co.,* 106 Me. 465, 76 Atl. 926, Am. St. Rep. 355; *Chapman* v. *Bates,* 61 N. J. Eq. 658, 47 Atl. 638, 88 Am. St. Rep. 459; *Boyer* v. *Nesbitt,* 227 Pa. 398, 136 Am. St. Rep. 890; *Ecker* v. *Kentucky Refining Co.,* 144 Ky. 264, 138 S. W. 264.

It sufficiently appears from the contract itself that its purposes were in all respects legitimate. By it the petitioner surrendered its security in one form, and took it back in another.

The transfer of the stock was not only based on a sufficient consideration, but the trust was coupled with an interest, and consequently the agreement regarding it was irrevocable. It also sufficiently appears from the contract itself, read in the light of the relation of the parties and the circumstances surrounding its execution, that the provisions of secs. V and VI were of the essence thereof. The petitioner's agreement not to foreclose was, by implication, conditioned on the defendant's performance of the agreements covered by sec. VI. These were repudiated by the defendant, and thereupon the petitioner had the right to treat the whole contract as at an end. This was a right which might be waived, but there is nothing to show that the petitioner did waive it, nor is it so claimed.

It follows that the foreclosure proceedings were not premature.

In taking the accounting between these parties, the master makes use of the defendant's specification as a basis. This showed a balance due the petitioner of $67,150.39. To get this balance, the defendant credits itself with $18,000 for storing granite at Northfield, and $6,500 for two large eagles that were to be mounted on the station at Washington. These two items were disputed by the petitioner. So the master, in order to reduce the defendant's account to undisputed items, properly adds these items to the defendant's balance, making it $91,650.39. This sum, the master says, is the balance of admitted items. This left two items claimed by the petitioner and contested by the defendant, as follows:

1. Setting 256,705 cubic feet of granite for the Washington Station at cost plus ten per cent., $161,412.09.

2. Interest on mortgage and advances prior thereto, $70,255.43.

It also left four items claimed by the defendant and contested by the orator, as follows:

1. Cost of storing granite at Northfield, $18,000.

2. Cost of making two eagles, $6,500.

3. Salary paid Goldwin Starrett, 7 months at $208.33, and 32 months at $416.66.

4. Damage for failing to assist defendant in obtaining contract for Wisconsin Capitol.

The report shows that at some time after the original contract for furnishing the cut stone and granite work for the Washington Station was made, these parties entered into a further arrangement whereby the petitioner was to set the granite, at cost plus ten per cent. In this arrangement it was stipulated that in addition to the actual cost of labor and materials involved in this work, the term "cost" should include the *pro rata* expense of moving and raising derricks, the *pro rata* expense of transporting equipment to and from the site, the *pro rata* damage due to wear and tear of such equipment, the salary of a superintendent, and expense of setting up such derricks and equipment for special setting of granite as could not be used for other purposes. It is found that the expense of setting this granite was largely increased by conditions which existed at the site, and also by faulty cutting and delay in shipment. In making up the account on this item, the master holds the petitioner chargeable for the conditions existing at the site, and makes a material reduction in the charge for setting the granite on account of unnecessary expense incurred thereby. He also makes allowance against the defendant for bad manufacture and delay in shipment, and fixes upon $110,383.15 as the sum properly chargeable for setting the granite.

The master allowed the petitioner interest to the amount of $70,255.43. Of this, $67,000 is the simple interest at six per cent. on the mortgage debt from the date of the mortgage to February 28, 1911,—an arbitrary date apparently agreed upon by all concerned. The balance of the interest, $3,255.43, is on advances made to the defendant by the petitioner prior to the execution of the mortgage.

The master allowed the defendant the amounts claimed for storing granite at Northfield and for the eagles,—$18,000 and $6,500, respectively, but disallowed the claim for salary paid Goldwin Starrett and the claim for damages on account of the loss of the Wisconsin Capitol contract.

The result was a balance due the petitioner on February 28, 1911, of $247,788.97.

When the master's report came in, the defendant moved to recommit the same, as has been already stated. It now argues that this motion should have been granted, and that we should reverse the decree and remand the case for a recommittal. But

the motion was addressed to the discretion of the chancellor, and there being nothing presented to take the case out of the general rule, we cannot revise his ruling thereon. *Allen's Admr.* v. *Allen,* 79 Vt. 173, 64 Atl. 1110; *Van Dyke* v. *G. T. Ry. Co.,* 84 Vt. 212, 78 Atl. 958.

As has also been stated, the defendant filed exceptions to the report, which were overruled. In taking up these exceptions for consideration, we find that many of them,—and this number includes some of the most important ones,—are unavailing because they fail to meet the requirements of our well-established rules of practice. They are numbered from 1 to 16, inclusive, and for convenience and brevity they will be referred to by number.

Nos. 1, 13 and 14 are expressly waived; and No. 3 is admitted to be of no importance.

Nos. 2 and 4 omit to state the grounds on which they are predicated, and so are not for consideration. *Fife and Child* v. *Cate,* 85 Vt. 418, 82 Atl. 741.

Nos. 5, 7, 8, 10, 11 and 16 involve a consideration of the evidence, which is not sent up and so is not before us. Consequently, these avail nothing. *Child* v. *Pinney,* 81 Vt. 314, 7 Atl. 566; *Van Dyke* v. *G. T. Ry. Co., supra; Whitcomb* v. *Whitcomb,* 85 Vt. 76, 81 Atl. 97; *Barber* v. *Bailey,* 86 Vt. 219, 84 Atl. 608.

Nos. 4 and 5 contain what amounts to a request to report the evidence upon which certain findings were based. The requests were not complied with. Without saying that these requests were seasonable, but treating them so, they are of no avail here. There being no order made by the chancellor, either when the case was sent out to the master or when the report came in, the requests were addressed to the master's discretion, and his failure to comply with them affords no ground for a reversal of the decree. *Randall* v. *Randall,* 55 Vt. 214; *Fife and Child* v. *Cate, supra.*

No. 6 relates to the failure of the master to comply with the defendant's request that the petitioner be required to produce its books showing the entire cost of certain items of which the defendant was charged a *pro rata* share. But such a request also is, ordinarily, addressed to the discretion of the master, and

not revisable.    *Mott* v. *Harrington,* 15 Vt. 185; *Ward* v. *Baker,* 16 Vt. 287.

No. 15 is to the alleged failure of the master to give the defendant credit "for the amount of expense in taking down and resetting a portion of the wall, which it was conceded" should be so credited. The report makes no mention of such an item. Standing alone, there is nothing to show to what this exception refers. From the defendant's brief, however, we conclude that it relates to extra work in setting the stone made necessary by the fault of the petitioner. If so, it must be presumed, the contrary not appearing that a proper allowance therefor was made by the master in arriving at the balance found due for the setting as hereinbefore set forth. *Hobart's Admr.* v. *Vail,* 80 Vt. 152, 66 Atl. 820.

No. 9 relates to the claim for salary paid Goldwin Starrett. The report shows that at the time the petitioner took the contract for the Washington Station, Starrett was its secretary, and was drawing a salary of $5,000 per year. He formed a partnership with E. B. Ellis, and the firm made a contract with the petitioner to furnish the granite. Subsequently the defendant corporation was formed and Ellis and Starrett transferred this contract to it. All understood from the first that this was to be done. In November, 1903, Starrett moved to Northfield and entered actively into the business of the defendant. It was then understood that the petitioner was to continue to pay Starrett's salary until the contract for the Washington Station was completed. Pursuant to this understanding, the petitioner continued to pay this salary until June, 1904, when it notified the defendant that from that time on it would pay only one-half the salary, and that the defendant must pay the other half. From this time to January 1, 1905, the defendant, without protest paid one-half of Starrett's salary. At that time, the petitioner notified the defendant that from then on the defendant must pay the entire salary. Since then, the defendant has, without protest, paid the whole of the salary. It now claims allowance for the sums so paid. The master finds, in effect, that the original contract became modified according to demands of the petitioner by the consent and understanding of the parties. The exception is, not that the finding is unwarranted or that the effect of the conduct of the parties is not what the master makes it, but that the

finding is uncertain and contradictory, so as to make doubtful the defendant's right to charge the petitioner with the payments made. But this claim is unfounded, the master's meaning is plain enough; and there is no such contradiction or uncertainty in his findings as should affect the result at which he arrives.

No. 10, besides involving questions which require a consideration of the evidence, includes the further grounds that the findings excepted to are argumentative and some immaterial to the issue. These grounds are not covered by the brief, and so are not considered.

No. 12 relates to the findings regarding the value of the property. The grounds assigned for this exception are that these findings are evasive, uncertain and insufficient, and that the burden is on the petitioner. All that the defendant says about this exception in his brief is that "we claim the burden of proof was upon the orator to establish this fact by a fair balance of evidence, and not having done so, the defendant is entitled to a finding by this Court upon the report of the master that the property is not inadequate security for the indebtedness." But the master lays all the facts before the chancellor. He says that to start new, buy and open a quarry, and install this equipment and machinery would very likely cost something like the estimates put upon the property by the defendant's witnesses,— $200,000 to $300,000; that as a going proposition, in competent hands, with capital and credit, and contracts ahead the property would be worth this amount. But that in view of the facts that the sheds are closed, the machinery idle, the quarry littered, the organization disbanded, and no contracts are in sight, it would not sell for much more than $60,000. We think the report is sufficiently direct and certain to afford a guide to the chancellor's judgment in fixing the time of redemption.

Some other questions were argued before us, but as we have suggested they are not presented by the record.

*Decree affirmed and cause remanded. Let a new time of redemption be fixed.*

HASELTON, J., concurs in the result.